UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                   :

MARIA M. HERNANDEZ,             :

                                 :         13-CV-03035 (RPP)

                                 :        **OPINION & ORDER**

             Plaintiff,           :

                                 :

     -against-             :

                                 :

CAROLYN COLVIN,              :
COMMISSIONER OF SOCIAL SECURITY,   :

                                 :

            Defendant.         :

                                 :
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      The Plaintiff Maria Hernandez brings this action under the Social Security Act (the

"Act"), 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Social Security

Commissioner (the "Commissioner") to deny her application for disability insurance benefits.

On February 6, 2012, Administrative Law Judge Gitel Reich (the "ALJ") found that the Plaintiff

was not disabled within the meaning of the Act.  The Appeals Council (the "Council") denied the

request for review, which made the ALJ's decision the final determination.  See Perez v. Chater,

77 F.3d 41, 44 (2d Cir. 1996); 20 C.F.R. §§ 404.981.  Both parties now move for judgment on

the pleadings.  For the reasons discussed herein, the Commissioner's motion for judgment on the

pleadings is DENIED and the Plaintiff's motion for judgment on the pleadings is GRANTED to

the extent of remanding the case to the Commissioner.

I.       **BACKGROUND**

    A.    **Procedural History**

      On March 29, 2011, the Plaintiff filed concurrent applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI").  (Soc. Sec. Admin. R. ("R.") at

110, Oct. 1, 2013, ECF No. 9.)  The applications were denied on May 18, 2011.  (R. at 61-68.)

On January 5, 2012, the ALJ, Gitel Reich, held a hearing, at which an attorney, Bryce

Kirshbaum, represented the Plaintiff.  (R. at 41-58.)  On February 6, 2012, the ALJ's written

decision found the Plaintiff not disabled within the meaning of the Act.  (R. at 28-37.)  On March

18, 2013, the Council denied review, at which point the ALJ's decision became the

Commissioner's final decision.  (R. at 5-10.)

     The Plaintiff filed a timely motion for judicial review pursuant to 42 U.S.C. § 405(g) on

October 30, 2013.  (Pl.'s Mem. of L. in Supp. of Mot. for J. on the Pleadings ("Pl.'s Mem."),

ECF No. 12.)  The Defendant answered on March 19, 2014 that the Commissioner's decision

was supported by substantial evidence and without legal error, and cross moves for judgment on

the pleadings.  (Def.'s Mem. of L. in Supp. of the Cross-Mot. for J. Pleadings & in Opp'n to Pl.'s

Mot. for J. on the Pleadings ("Def.'s Mem."), ECF No. 20.)  The Plaintiff replied on April 1,

2014.  (Pl.'s Reply Mem. of L. in Supp. of Mot. for J. Pleadings ("Pl.'s Reply"), ECF No. 22.)

     The issue before this Court is whether the Commissioner's decision that the Plaintiff was

not disabled during the relevant time period is supported by substantial evidence and without

legal error.

### B.    Non-Medical Evidence Before the Administrative Law Judge

     The Plaintiff was born February 29, 1964 in the Dominican Republic.  (R. at 110, 257.)

She was forty-seven years old at the time of her application.  She has an 11th grade education (R.

at 187), and communicates in Spanish.  (R. at 43).  On June 26, 2010, the Plaintiff's 18-year-old

son died in a car accident.  (R. at 47.)  This event triggered the Plaintiff's alleged disability.

     Before her alleged disability, the Plaintiff reported that she was able to "bathe daily,

work, exercise, read, dance, [go] outside, sleep good [sic], [and] have [a] good appetite."  (R. at

157.)[1]  She worked steadily at assorted jobs, including jobs in maintenance at an apartment

building, as a housekeeper at a hotel, and as a child care provider at a day care.  (R. at 169.)

These jobs all involved the lifting of ten to twenty pounds.  (R. at 170-75.)  Except for the

Plaintiff's child care work, these previous positions required her to stand most of the day.  (R. at

170-75.)

  After her son's death in 2010, the Plaintiff began to experience an increase in anxiety,

depression, and fatigue, along with a decrease in energy and appetite.  (R. at 164.)  She reported

that these symptoms limited her ability to function as before.  The Plaintiff reported that she

could feed herself simple meals, such as cold cereal and mashed potatoes, on a daily basis—

though she often lacked the energy and appetite.  (R. at 158.)  She stated that her daughter helps

her clean, and does the laundry and ironing.  (R. at 159.)  The Plaintiff reported that she attends

therapy appointments twice a week, and church once a week, by riding the bus; however, she

never goes alone because she is "always nervous" and forgets stops and directions.  (R. at 159.)

  At the hearing before the ALJ, the Plaintiff testified that, since her symptoms began, she

has held only one job as a bus attendant in September and October of 2010.  (R. at 49-50.)  The

Plaintiff claimed that she left because she kept forgetting to help children cross the streets.  (R. at

49-50, 140.)  The Plaintiff testified she has not engaged in any other type of work (R. at 49), and

is unable to work because she "forgets everything and cries all day" (R. at 51).  She reported that

she has difficulty completing tasks, concentrating, and following spoken instructions.  (R. at 163-

164.)  She reported that she can follow written instructions, however.  (R. at 163.)

---

[1] On April 14, 2011, Plaintiff completed forms about her work and daily activities for the Social Security
Administration and the New York State Office of Temporary and Disability Assistance, Division of Disability.  (R.
at 137-77).  These forms, along with her testimony at the hearing, constitute the primary sources concerning the
Plaintiff's conditions.  See generally 20 C.F.R. § 404.1512 (Evidence).

The Plaintiff began receiving treatment a few months after her son's death.  (R. at 189, 253.)  The Plaintiff testified that her depression and anxiety, with medications, has improved "a little bit."  (R. at 48.)  Her anxiety attacks occur daily and last for fifteen minutes or longer until the pills stop it.  (R. at 164-65.)  She testified that her sessions with the psychologist were helpful.  (See R. at 49.)

The Plaintiff testified that she is able to leave her home to attend church and meet with doctors, but that she is always accompanied by her younger daughter, with whom she lives.  (R. at 52.)  Her daughter and her mother take care of home maintenance.  (R. at 53.)  The Plaintiff testified that she spends the day watching television, praying, and reading the Bible.  (R. at 53.) She experiences serious episodes of depression about three times a week, in which she spends the day in bed with the lights off.  (R. at 54.)  On better days, she can prepare simple meals for herself, but otherwise, her daughter or mother provides food.  (R. at 54.)  She testified that in an eight-hour day, she can stand or sit for about three hours.  (R. at 55.)  She cannot lift a gallon of milk.  (See R. at 55.)

### C. Medical Evidence before the Administrative Law Judge

The record contains medical files from both treating and non-treating physicians, who treated or evaluated the Plaintiff between October 2010 and December 2011.

### 1. Dr. Claudia Patino

The Plaintiff was treated by Dr. Claudia Patino, a psychologist, on a biweekly basis beginning October 11, 2010.  (R. at 255.)  Dr. Patino's notes summarizing the therapy sessions from March to August 2011 are contained in the record.  During that period of time, Dr. Patino found the Plaintiff's Global Assessment Functioning ("GAF") score to be in the range of 55 to

57.[2]  (R. at 257-270.)  Throughout their relationship, Dr. Patino described the Plaintiff's reported symptoms as "daily sadness and crying, little interest in anything, insomnia, forgetfulness, lack[] [of] energy, [and] intrusive thoughts of [the Plaintiff's] son and finding him dead."  (R. at 257.)  Dr. Patino also reported that the Plaintiff was "initially …. fearful of being home alone, [that she] worrie[d] about [her] daughters' safety, and [was] overprotective [and] fearful of trains." (R. at 257.)

Dr. Patino also catalogued the Plaintiff's signs of improvement.  She reported that on March 17, 2011, the Plaintiff had engaged in "behavioral activation" by spending time with her daughter, visiting her priest, and arranging a birthday party for a friend.  (R. at 258.)  According to Dr. Patino, the Plaintiff reported that her anxiety was less intense and that the prescribed medications were helping.  (R. at 258.)  On April 28, 2011, Dr. Patino described additional signs of improvement despite the ongoing depression: the Plaintiff "finally cooked on two occasions," "kept a log of her thoughts," and tried to spend time with her family instead of isolating herself. (R. at 262.)

Throughout the notes, Dr. Patino reported that the Plaintiff experienced obsessive thoughts about her son, who had died on the day of his graduation ceremony.  (See, e.g., R. at 260, 263.)  However, on May 19, 2011, Dr. Patino noted that the Plaintiff was able to attend two graduation ceremonies with her family, even if doing so prompted memories of her son.  (R. at 263.)  While Dr. Patino expressed concern on June 2, 2011 that the Plaintiff's thoughts of her son were beginning to show "psychotic quality," (R. at 265), a few weeks later, Dr. Patino reported

---

[2] A GAF score is a "clinician's judgment of [an] individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994).  A score of 61-70 indicates "mild symptoms"; 51-60 indicates "moderate symptoms"; and 41-50 indicates "serious symptoms[.]"  Id. at 32.

that the Plaintiff denied that any psychotic features were linked with her depression and reported her guilty ruminations about her son had decreased.  (R. at 266.)

According to Dr. Patino's report, a few days before the upcoming anniversary of her son's death, the Plaintiff reported that she had been feeling less depressed and anxious.  (R. at 266.)  In the month after the anniversary, the Plaintiff reported that she was more active—going to church more, spending more time with her family, and praying often.  (R. at 267.)

On December 22, 2011, a few weeks before the hearing, Dr. Patino wrote that the Plaintiff described "continued depression especially during [the] recent holidays."  (R. at 300.)  On that day, Dr. Patino assigned to the Plaintiff a GAF score of 52, which was lower than any GAF score the Plaintiff had previously been assigned.  Dr. Patino also wrote a letter detailing the Plaintiff's reported symptoms.[3]  (R. at 255.)  Dr. Patino concluded that the Plaintiff's severe depression inhibited the Plaintiff's ability to work at the time.  (R. at 255.)

### 2. Dr. Daniel Pilowsky

The Plaintiff also received treatment from Dr. Daniel Pilowsky, a psychiatrist, on a monthly basis during roughly the same period.  On February 22, 2011, Dr. Pilowsky completed a psychiatric evaluation of the Plaintiff.  (R. at 238-39.)  Dr. Pilowsky listed as Plaintiff's symptoms, which he found representative of severe anxiety and depression, the following: persistent high levels of anxiety, with occasional tachycardia and "shaking"; daily and constant sadness accompanied by crying; poor sleep; low energy; increased fatigue; variable concentration; and a poor appetite with significant weight loss.  (R. at 238.)  Dr. Pilowsky found that the Plaintiff's cognition and memory were "grossly intact," and her affect, "though intense,"

---

[3] Specifically, the symptoms noted by Dr. Patino included "daily sadness and crying, less interest and motivation, insomnia, forgetfulness, lacks energy, loss of libido, intrusive thoughts of son. . . . [and] severe anxiety on some days."  (R. at 255.)

was appropriate.  (R. at 238.)  Throughout the treatment relationship, Dr. Pilowsky reported that

the Plaintiff remained "clinically depressed and very anxious."  (R. at 261.)  Additionally, on

May 24, 2011, Dr. Pilowsky reported that the Plaintiff showed signs of Post-Traumatic Stress

Disorder ("PTSD").  (R. at 264.)  The PTSD symptoms included nightmares about car accidents

and feelings that someone else in the family would have an accident similar to her son's.  (R. at

264.)

On July 19, 2011, Dr. Pilowsky wrote that the Plaintiff "remains severely depressed" and

that "[p]sychologically, it has been a very slow process [for the Plaintiff] to begin to accept that

her son is dead.  [H]e was at the center of her life, and her greatest hope."  (R. at 240.)  Dr.

Pilowsky reported that because the Plaintiff's previous antidepressant was not helpful, it would

be replaced by a new medication.  (R. at 240, 268.)  No further reports from Dr. Pilowsky are in

the record after August 16, 2011.

### 3.    *Dr. Sandy Charles*

The Plaintiff's primary care physician is Dr. Sandy Charles.  On April 6, 2011, Dr.

Charles completed a routine exam of the Plaintiff.  (R. at 271.)  Her chronic diagnoses included

depression.  (R. at 271.)  She reported that the Plaintiff continued "to feel anxious and frequently

cries."  (R. at 271.)  Her sleeping, however, had improved and the Plaintiff reported "good

family support."  (R. at 271, 272.)  The Plaintiff also complained of worsening forgetfulness in

the past few months, which Dr. Charles believed was related to the Plaintiff's depression.  (R. at

271, 275.)  According to Dr. Charles, the Plaintiff described "muscle tension" throughout her

body and "diffuse weakness," but she still had the full range of motion at all joints.  (R. at 272,

274.)

Medical records from the summer of 2011 contain follow-up exams by primary care physicians other than Dr. Charles.  On May 6, 2011, Dr. Finkelstein found that the Plaintiff had an improved mood and prescribed a pain medicine for her myalgia.  (R. at 279.)  On May 31, 2011, Dr. Erica Farrand and Dr. Tamika Blackburn reported that the Plaintiff's symptoms from depression were "slightly better than a year ago, but generally not significantly improved."  (R. 282.)  Dr. Farrand also reported that the Plaintiff's depressed mood was worse in April because it was the Plaintiff's son's birthday, and the one-year anniversary of his death was approaching. (R. at 282.)  The Plaintiff also stated to her physician that "she has a lot of family support."  (R. at 282.)

On December 13, 2011, Dr. Charles completed a Multiple Impairment Questionnaire. (R. at 291-299.)  She reported that the Plaintiff's diagnoses were major depressive disorder and anxiety disorder.  (R. at 292.)  Dr. Charles found in her prognosis that the Plaintiff "continue[d] to have severe depression despite continued psychotherapy and uptitration of antidepressants," and that she will "likely require more than one year for her symptoms to improve."  (R. at 292.) Dr. Charles wrote that this prognosis was supported by Plaintiff's "flat affect [and] continuous crying," and by the Plaintiff's "[d]ifficulty sleeping, lack of energy, anxiety, and forgetfulness as a result of difficulty concentrating."  (R. at 292.)  She wrote that the Plaintiff was incapable of tolerating even low work stress, and that the Plaintiff would need four to five one-hour long unscheduled breaks during a normal work day.  (R. at 297.)

On December 13, 2011, Dr. Charles also wrote a letter to describe the Plaintiff's condition.  (R. at 253.)  Dr. Charles detailed the Plaintiff's treatment and the drug therapies that the Plaintiff had undergone since coming to the clinic in September 2010.  (R. at 253.)  Dr. Charles reported that the Plaintiff continued to be overwhelmingly sad and that she cried

throughout the day.  (R. at 253.)  She concluded that the Plaintiff "is incapable of working full-time in a normal, competitive setting because her depression makes it difficult for her to concentrate in order to accomplish specific tasks."  (R. at 253.)

### 4.    Physical Therapists

On the recommendations of her primary care physicians (R. at 284), the Plaintiff saw a physical therapist in July, August, and September of 2011.  On August 17, 2011, Siegfred Cruz, P.T., wrote that since July 19, 2011, the Plaintiff had seen him for hand pains, decreased ability to perform daily activities, decreased grip strength, and sleep disturbance.  (R. at 242.)  Mr. Cruz noted that her potential for recovery was "good."  (R. at 242.)

In a note dated November 9, 2011, Joel Cruz, P.T., wrote that the Plaintiff had seen him for physical therapy since September 14, 2011.  (R. at 251.)  He had treated Plaintiff for pain in her left knee, hand, and back; loss of motion in her left knee and hand; tenderness on her left knee, hand, and back; and difficulties with activities of daily living.  (R. at 251.)  Her potential for recovery was also noted as "good."  (R. at 251.)

### 5.    Dr. Michael Alexander

On May 6, 2011, Plaintiff was examined by two consulting physicians.  The first, Michael Alexander, Ph.D., conducted a psychiatric evaluation.  Dr. Alexander reported that the Plaintiff had difficulty sleeping, and a loss of appetite.  According to Dr. Alexander, the Plaintiff stated that the medications "does help reduce the intensity of her symptoms."  (R. at 211.)

Dr. Alexander also conducted a mental status examination.  Dr. Alexander described the Plaintiff as "cooperative, friendly, and alert . . . ."  (R. at 212.)  Her social skills were "adequate" and she looked "well-groomed."  (R. at 212.)  Dr. Alexander found that she was "coherent and goal-directed" in her thought processes, her affect was of "full range and appropriate in speech

9

and thought content," and her attention, concentration, and memory skills were "intact," as found by a simple memory test.[4]  (R. at 212-13.)  He found her cognitive functioning to be somewhat below average.  (R. at 213.)  Her insight and judgment were adequate.  (R. at 213.)  The Plaintiff said she was able to dress, bathe and groom herself, although her daughter and sister did the cooking, cleaning, and shopping because of back pain.  (R. at 213.)  According to Dr. Alexander, while the Plaintiff exhibited psychiatric symptoms, they were not "significant enough to interfere with the [Plaintiff's] ability to function on a daily basis."  (R. at 213.)

On the basis of this examination, Dr. Alexander concluded that the "Plaintiff can follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others, and can appropriately deal with stress."  (R. at 213.)

### 6.    *Dr. Vinod Thurkal*

The second consultative examination was performed by Dr. Vinod Thukral, an internist. Dr. Thukral noted that the Plaintiff reported dull and intermittent right shoulder pain, and a lower backache that had lasted for five months.  (R. at 215.)  Her asthma could be relieved by medication or rest.  (R. at 216.)  Dr. Thukral reported that the Plaintiff could not stand for a long time because of back and shoulder pain, which is why her daughter takes care of the cooking, cleaning, laundry, and shopping.  (R. at 216.)  In his examination, Dr. Thukral observed that the Plaintiff appeared to be in no "acute distress": her gait was normal, and she could walk on her heels and toes without difficulty.  (R. at 216.)  He concluded that, on the basis of his

---

[4] "The claimant was able to count, perform simple calculations on her fingers, and attend to the questions in this examination without difficulty.  She was unable to perform serial 3s correctly due to limited ability with arithmetic." (R. at 212.)

examination, her prognosis was fair and she had no physical limitations for sitting, standing, pulling, and pushing.  (R. at 218.)

### D.       Medical Evidence Submitted to the Council

After the ALJ rendered his decision that the Plaintiff was not disabled, the Plaintiff's counsel submitted the decision to the Appeals Council for review.  In requesting review, the Plaintiff submitted new psychiatric reports to support the Plaintiff's alleged disability.  Review was denied on March 18, 2013.

New evidence submitted to the Council contained psychiatric reports from two new physicians, as well as an additional impairment questionnaire from Dr. Charles.  (R. at 204-07.) The new physicians, Dr. Lewis Fox and Dr. Ronald A. Sherman, met with the Plaintiff for the first time after the Plaintiff's hearing.  (Pl.'s Mem. Ex. B, at 8; Pl.'s Mem. Ex. C, at 3.)

The Impairment Questionnaire submitted by Dr. Fox, a psychiatrist, was based on examinations of the Plaintiff between February 9, 2012 and May 7, 2012.  Dr. Fox concluded that the Plaintiff was incapable of handling even low stress and that her depression limited her ability to work.  (Pl.'s Mem. Ex. B. at 7.)

The Impairment Questionnaire and Narrative Report from Dr. Sherman were based on an examination of the Plaintiff on January 13, 2013.  (Pl.'s Mem. Ex. D, at 1.)  Dr. Sherman concluded that the Plaintiff "was totally disabled emotionally and unable to function in any job." (Id.)

The Plaintiff also submitted a new report from Dr. Charles, based on a monthly check-up on April 2, 2012.  (Pl.'s Mem. Ex. A, Impairment Questionnaire.)  The report described similar symptoms as were described in previous reports from Dr. Charles, such as "[p]ersistent crying, anxiety, saddness [sic], lack of energy, [and] difficulty concentrating."  (Id. at 3.)  Dr. Charles

11

reported that, in most activities, the Plaintiff's understanding and memory, sustained concentration and persistence, social interactions, and adaptation were "markedly limited."  (Id. at 3-6.)  She concluded that the Plaintiff "cannot tolerate additional work stress," and that the Plaintiff is "consistently depressed with minimal variation."  (Id. at 6.)

## II.  APPLICABLE LAW

### A.  Scope of Judicial Review

Judicial review of the Commissioner's decision denying disability benefits is strictly limited.  Baneky v. Apfel, 997 F. Supp. 543, 544 (S.D.N.Y. 1998).  The role of the federal courts is to decide whether the Commissioner has applied the appropriate legal standards and whether the Commissioner's findings of fact are supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3) (2010); see also Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citations omitted).  If the Court finds that there is substantial evidence for the determination, the Commissioner's decision must be upheld.  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (internal citations omitted).  This is so even where substantial evidence may support the plaintiff's position and where the Court's independent analysis of the evidence may differ from the ALJ's.  Id.  Substantial evidence in this context has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).

This deferential standard of review does not apply to the ALJ's legal conclusions.  Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir.2003).  "[W]here an error of law has been made that might have affected the disposition of the case," the court will not defer to the ALJ's determination.  Pollard v. Halter, 377 F.3d 183, 189 (2d Cir.2004) (internal quotation marks

omitted).  Rather, an ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Id.  Legal error can include failure to adhere to the applicable regulations.  See Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir.2008).

### B.  Disability Determination

A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2004).

The determination whether a person is under a disability within the meaning of the Social Security Act belongs to the Commissioner.  20 C.F.R. § 404.1527(d)(1).  The Commissioner has established a five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520, which the Second Circuit has articulated as follows:

> First the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir.1998) (internal citation omitted).

A claimant bears the burden of proof as to the first four steps.  Perez v. Chater, 77 F.3d

41, 46 (2d Cir. 1996).  If a claimant is able to meet her burden of proof through the first four steps, the burden then shifts to the Commissioner to provide evidence "to show there is other gainful work in the national economy which the claimant could perform."  Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks and citation omitted).  It must be noted that this burden shift is limited.  The Commissioner need only show that there is work in the national economy that the claimant can do.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  The Commissioner does not need to provide additional evidence of the claimant's residual functional capacity, or the ability to work, that is determined at the fourth step.  Id.; see also 20 C.F.R. § 404.1560(c)(2) ("We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.")

C.     **The ALJ's Decision**

In a written decision dated February 6, 2012, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act from June 26, 2010 to the date of the decision.  (R. at 37.)  The ALJ reviewed the evidence using the five-step evaluation guidelines found in 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since June 26, 2010.  (R. at 30.)  At step two, the ALJ determined that the Plaintiff's depression, anxiety, asthma, and back and right shoulder conditions were "severe impairments"—that is, more than slight limitations on her physical and mental abilities to do basic work activities.  (R. at 30.)

At step three, the ALJ determined that the Plaintiff's conditions, while severe, were not a disability per se under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 30 (finding the Plaintiff's severe impairments to be "depressive disorder, anxiety disorder, history of asthma, [and] unspecified back and right shoulder conditions").)  The ALJ found in her listing assessment that the Plaintiff had no restrictions in attending to the activities of daily living; that the Plaintiff had mild difficulties with social functioning; and that the Plaintiff had moderate difficulties with concentration and persistence.  (R. at 31.)

At step four, the ALJ reviewed the evidence to determine the most work that Plaintiff could still do despite her limitations—or what is termed her "residual functional capacity" ("RFC"). [5]  (R. at 32.)  The ALJ concluded that the Plaintiff was still able to perform light work,[6] "with two to three step instructions, frequent [but] not constant contact with people, and not in a fast-paced environment."  (R. at 32.)

In reaching this conclusion, the ALJ noted that, despite the Plaintiff's functional limitations, the Plaintiff was still able to engage in various activities of daily living without assistance.  (R. at 35.)  She could bathe, dress, and clothe herself; she maintained close relationships with her family members; she spent time reading and watching television; she was able to engage in cooking and other daily activities.  (R. at 35.)  Thus, the Plaintiff's statements

---

[5] The regulations define "residual functional capacity" as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.C. §§ 404.1545(a), 416.945(a).

[6] The regulations describe light work as follows: "[W]ork [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

concerning "the intensity, persistence, and limiting effects of [her symptoms were] not credible to the extent that they [were] inconsistent" with the ALJ's RFC assessment.  (R. at 35.)

The ALJ also considered the Plaintiff's response to drug treatment in the credibility analysis.  (R. at 35.)  The ALJ noted that, while the Plaintiff reported in February 2011 that medications were not relieving her symptoms, three months later she reported to Dr. Alexander that the medications she was using were helpful.  (R. at 35.)  The ALJ noted that the Plaintiff had testified that the medications helped, and that psychotherapy had also been helpful.  (R. at 35.) The ALJ also found that Dr. Patino's treatment notes supported a finding that the Plaintiff had learned better coping skills since her son's death.  (R. at 35.)

The ALJ did not fully credit Dr. Charles's assessment of the Plaintiff's inability to work, noting that Dr. Charles is an internist and therefore had no specialty entitled to more deference. (R. at 35.)  Additionally, the ALJ noted that Dr. Alexander's psychiatric evaluation and clinical findings on May 11, 2011 contradicted Dr. Charles's opinion about the Plaintiff's ability to perform light work.  (R. at 34.)  The ALJ concluded that the Plaintiff's own testimony did not support Dr. Charles's opinion.  (R. at 35.)  Therefore, the ALJ assigned "little weight" to Dr. Charles's opinion.  (R. at 35.)

The ALJ accorded Dr. Patino's opinion "some weight, but not controlling weight" because the GAF scores of moderate symptoms that Dr. Patino had assigned the Plaintiff did not support the psychologist's conclusion that Plaintiff was unable to work at the time.  (R. at 35.)

The ALJ accepted Dr. Alexander's assessment that Plaintiff's psychiatric problems "were not significant enough to interfere with [her] ability to function on a daily basis."  (R. at 33.)  The ALJ gave Dr. Alexander's opinion "some weight."  (R. at 36.)  The ALJ also found that Dr. Thukral's internal medicine examination did not support the severity of the symptoms as

expressed by the Plaintiff and credited Dr. Thukral's assessment that the Plaintiff had no limitations preventing her from sitting, standing, pulling, pushing, and other related activities. (R. at 35.)

The ALJ then continued to step five, at which point the burden is on the Commissioner to show that the claimant has the capacity to perform other jobs, based on the Plaintiff's RFC, age, education, and work experience.  (R. at 36.)  To sustain this burden, the ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P (the "Grid") to determine whether there existed enough jobs in the national economy that the Plaintiff could perform.  (R. at 37.) The ALJ determined that the applicable framework, Medical-Vocational Rule 202.16, directed a finding of "not disabled."  (R. at 37.)  The ALJ added, without explanation, that any of the Plaintiff's "additional limitations have little or no effect on the occupational base of unskilled light work."  (R. at 37.)  Thus, based on the ALJ's earlier conclusions about the Plaintiff's RFC, the applicable Grid directed a finding of "not disabled."

## III.    DISCUSSION

The Plaintiff argues that the ALJ's decision was not based on substantial evidence and must be reversed.  Specifically, the Plaintiff argues that: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to evaluate properly Plaintiff's credibility; (3) new and material evidence before the Appeals Council warrants remand; (4) and the ALJ erred by relying on the Medical-Vocational guidelines.  Each of these objections is addressed below in turn.

### A.    The Treating Physician Rule

The Plaintiff argues that the ALJ failed to follow the "treating physician rule," 20 C.F.R. § 404.1527(c)(2), under which a claimant's treating physician is entitled to a measure of deference.  Specifically, the Plaintiff argues that the ALJ gave insufficient weight to Dr.

Charles's opinion that the Plaintiff "is incapable of working full-time . . . because her depression makes it difficult for her to concentrate in order to accomplish specific tasks."  (R. at 253).  The Plaintiff argues that, if credited properly, Dr. Charles's opinion would establish that the Plaintiff is entitled to disability benefits.

The expert opinion of a claimant's treating physician is generally entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  An ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion."  McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983); see also Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing McBrayer).

In certain circumstances, however, an ALJ is not obligated to give controlling weight to a treating physician.  See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (holding that because the "key medical opinions" of the treating physician "were not particularly informative" and were inconsistent with other medical evidence, the treating physician was not entitled to controlling weight); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (finding that the several other physicians who examined the claimant "made less favorable findings, and thus the treating physician's opinion was "inconsistent with the other substantial evidence").  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

When an ALJ decides against assigning controlling weight to a treating physician's opinion, he must still decide what weight it should receive.  20 C.F.R. § 404.1527(c).  Among other factors, an ALJ must consider the nature, length, and frequency of the treatment relationship; the opinion's supportability; and the physician's specialization.  20 C.F.R. §

18

404.1527(c)(2)(i)-(ii), (3)-(6); see also Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013).  An

ALJ must always give "good reasons" in deciding the weight to give a physician's opinion.  See

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. § 416.927(c)(2).  The

requirement that the ALJ provide good reasons for assigning weight to different medical

opinions greatly assists with the district court's review of an ALJ's decision, and "let[s]

claimants understand the disposition of their cases . . . ."  Snell, 177 F.3d at 134.

     In this case, the ALJ's decision not to give controlling weight to Dr. Charles's opinion

was based on a proper analysis.  First, the ALJ noted that Dr. Charles provided no "evidence of

any testing done to measure the claimant's concentration" to support the conclusion that the

Plaintiff was unable to work because her depression made it difficult to concentrate.  (R. at 34).

Second, the ALJ compared Dr. Charles' reports to the results of Dr. Alexander's psychiatric

evaluation in May 2011 and the Plaintiff's own testimony, and found that both were contrary to

Dr. Charles's conclusions.  (R. at 34.)  Because the ALJ considered both the diagnostic

techniques that Dr. Charles used to reach an opinion and the opinion's consistency with the rest

of the record, the ALJ's decision not to assign controlling weight was appropriate.  See Halloran,

362 F.3d at 31.

     The Plaintiff argues that the ALJ failed to specify how much weight she was giving to

Dr. Charles's opinion, but this contention has no merit.  After finding that Dr. Charles's opinion

should not be controlling, the ALJ proceeded to give "little weight" to Dr. Charles' opinion.  (R.

at 34.)  The ALJ reached this determination by following the requirements of 20 C.F.R. §

404.1527(c)(5).  First, she noted that Dr. Charles is an internist, not a psychiatrist.  (R. at 34).

Second, she found inconsistencies between Dr. Charles' opinion and other evidence in the

record,[7] and found that the record as a whole did not support Dr. Charles's conclusions.  (See R. at 35.)  The ALJ's analysis was properly focused on the multiple factors identified in the regulations and this Circuit's precedent in assigning weight to a medical opinion.  See Selian, 708 F.3d at 418; 20 C.F.R. § 1527(c)(2)(i)-(ii), (3)-(6).

For these reasons, it is clear that the ALJ's decision to give little weight to Dr. Charles's opinion was supported by substantial evidence, see Halloran, 362 F.3d at 32, and the ALJ's decision cannot be reversed on this ground.

**B.      The ALJ's Evaluation of the Plaintiff's Credibility**

Next, the Plaintiff argues that the ALJ failed to explain, with sufficient specificity, her reasons for rejecting the Plaintiff's testimony.  (Pl.'s Mem. at 18.)  The ALJ found that the Plaintiff's statements regarding the "intensity, persistence, and limiting effects of [the Plaintiff's] symptoms" were "not credible," noting that the Plaintiff was able to perform certain daily activities and that that the Plaintiff had responded positively to drug therapy  (R. at 35.)  The Plaintiff argues that the ALJ failed to consider the totality of evidence in making this credibility assessment.  (Pl.'s Mem. at 19-21.)

Under the regulations, the ALJ is required to consider a claimant's reports of pain and other limitations.  20 C.F.R. § 404.1529(a).  But an ALJ is "not require[d] to accept the claimant's subjective complaints without question."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir.2010) (citation omitted).  Rather, the ALJ "may exercise discretion in weighing the

---

[7] In particular, the ALJ considered (1) Dr. Alexander's May 2011 psychiatric evaluation; (2) Dr. Patino's treating notes; (3) the assigned GAF scores of moderate symptoms; and (4) the Plaintiff's own testimony, and found that all were inconsistent with Dr. Charles' conclusions.  According to the ALJ, these sources indicated that Plaintiff's symptoms have improved to the extent that she is capable of performing "light work."  (R. at 34-36.)

credibility of the claimant's testimony in light of the other evidence in the record." Id.  This requires a two-step process.

First, the ALJ must decide whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. § 404.1529(a); SSR 96-7p, 1996 WL 374186, at *2; see also Snell, 177 F.3d at 135. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and functionally limiting effects of those symptoms.  20 C.F.R. § 404.1529(c)(1).  Finally, because a claimant's symptoms "sometimes suggest a greater severity of impairment that can be shown by objective medical evidence alone," an ALJ may not reject the claimant's statements solely because objective medical evidence does not substantiate those statements.  20 C.F.R. § 404.1529(c)(2)-(3).  Rather, the ALJ must consider a number of factors listed in the regulations.[8]

In this case, the ALJ appropriately applied this standard.[9]  The ALJ determined that the Plaintiff's impairments could reasonably be expected to produce the alleged symptoms.  (R. at

_____

[8] The listed factors that the ALJ must consider are: (i) claimant's daily activities; (ii) location, duration, frequency, and intensity of claimant's symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (v) other treatment receive to relieve symptoms; (vi) any measures taken by the claimant to relieve symptoms; (vii) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

[9] The Plaintiff argues that the ALJ applied the wrong legal standard when she concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of [the Plaintiff's] symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment."  (Pl.'s Mem. at 19; R. at 35.) The Plaintiff is correct to the extent that an ALJ may not "discredit a claimant's subjective complaints on the basis of the ALJ's own finding of the claimant's RFC," but rather, must consider whether "the claimant's statements are credible in light of the objective record evidence."  Cruz v. Colvin, No. 12 CV 7346 (AJP/PAC), 2013 WL 3333040, at *15–16 (S.D.N.Y. July 2, 2013); see also Perrin v. Astrue, No. 11 CV 5110 (FB), 2012 WL 4793543, at *5 (E.D.N.Y. Oct. 9, 2012).  In other words, it is legal error to determine the ability to work before the credibility analysis of the Plaintiff's statements.  However, the language used by the ALJ in this case "can be harmless if the ALJ has otherwise explained his conclusion adequately."  Id. (citing Filius v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).  Here, the ALJ offered several reasons for her credibility assessment, which reflected the ALJ's consideration of the record as a whole.  See Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (a remand is unnecessary

35.)  The ALJ, however, noted several instances in which the evidence diverged from the Plaintiff's reports about limiting effects of her symptoms, and specifically considered the statements the Plaintiff made about her daily activities, social relationships, medications, and therapy.  (R. at 35.)  In each of these categories, the ALJ noted how both the medical records and the Plaintiff's own statements demonstrated that, despite her impairments, she could perform light work.  (R. at 32, 36.)

A review of the record confirms that substantial evidence supports this credibility finding.  For example, the Plaintiff's sleep improved since the onset of her symptoms.  (See R. at 271.)  The Plaintiff reported to Dr. Alexander that she bathes, dresses, and grooms herself without assistance.  (R. at 213.)  Furthermore, she also stated it is only because of her back pain that her daughter does the cooking, cleaning, and shopping.  (R. at 213; see also R. at 262 ("Plaintiff finally cooked on two occasions.").)  The Plaintiff also reported that her symptoms had decreased over time (e.g., R. at 267); and the Plaintiff learned coping strategies from Dr. Patino.  (R. at 258, 262, 267, 270.)  Several of the doctors who evaluated the Plaintiff noted her appropriate behavior and lack of physical limitations.[10]  The Plaintiff also testified to the ALJ that the psychotherapy with Dr. Patino had helped relieve her symptoms and that the medications helped at least somewhat.  (R. at 33, 49.)

---

when "the evidence of record permits [the court] to glean the rationale of an ALJ's decision.")  Accordingly, the Court finds that the ALJ applied the correct legal standard.

[10] Specifically, Dr. Alexander reported that the Plaintiff possessed coherent and goal-directed thought processes, normal affect, and a neutral mood (R. at 33); Dr. Pilowsky noted that the Plaintiff's cognition and memory were "grossly intact," and that her affect was appropriate (R. at 238); Dr. Thurkal concluded that the Plaintiff had no limitations sitting, standing, pulling, and pushing (R. at 218); and the Plaintiff reported to Dr. Alexander that the medication helped relieve her symptoms.

Taking the evidence together, it was reasonable for the ALJ to conclude that the Plaintiff's statements, regarding the intensity and persistence of her impairments, were not entirely credible.  Accordingly, the decision of the ALJ is not remanded on this basis.  <u>See</u> <u>Stanton v. Astrue</u>, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding ... where the ALJ identified specific record-based reasons for his ruling").

### C.        The Evidence Presented to the Council

Next, the Plaintiff argues that the evidence submitted to the Council warrants remand because of its materiality as to the Plaintiff's disability.  The new evidence contains a detailed assessment of the Plaintiff's daily activities by the treating physician, Dr. Charles, along with reports by Dr. Fox and Dr. Sherman that describe the Plaintiff's severe psychological impairments.  The Plaintiff argues that, taken as a whole, this medical evidence demonstrates a near-consensus of medical opinion that the Plaintiff is disabled.  The Plaintiff argues that, had the ALJ considered these additional reports, it is likely that the ALJ would have found the Plaintiff disabled.

New evidence submitted to the Appeals Council "becomes part of the administrative record for judicial review when the Council denies review of the ALJ's decision."  <u>Perez v.</u> <u>Chater</u>, 77 F.3d 41, 45 (2d Cir.1996) (citation omitted).  A court may order that a case be remanded to the Commissioner to consider additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ."  42 U.S.C. § 405(g).  The Second Circuit has summarized this three part showing:

> [A]n appellant must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, ... and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative.... The concept of materiality requires, in addition, a reasonable possibility

> that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.... Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir.1991) (citations and internal quotation marks omitted) (first bracket in original).

Here, the evidence submitted by the Plaintiff does not warrant remand.  First, the Plaintiff fails to show that the proffered evidence is "new and not merely cumulative."  Id.  The reports describe no limitations beyond those already contained in the record.

Second, the evidence is not material.  This is not a case where, for example, a treating physician diagnosed for the first time the root cause of a claimant's symptoms.  Cf. Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985) (neurological examination revealed for the first time the previously unknown cause of claimant's symptoms).  Here, because the new evidence contains information similar to that already considered by the ALJ, there is no reasonable probability that the ALJ would have decided the case differently based on the new evidence.

Finally, the Plaintiff fails to establish that the new evidence—at least, the reports by Dr. Fox and Dr. Sherman—relates to the period in question.  The reports from Dr. Fox and Dr. Sherman were rendered after the ALJ issued her decision, and while the Plaintiff's new doctors might have understood—based on the Plaintiff's own statements—that the Plaintiff's depression began in 2010, there is no basis for finding that their opinions are truly retrospective.  The new doctors' opinions were based on symptoms that the Plaintiff reported after the ALJ's decision, and, to the extent that the opinions contradict the evidence considered by the ALJ, the opinions

indicate that the Plaintiff limitations may have become more severe since the period in question.[11]

In sum, the new doctors' opinions have little probative value as to the Plaintiff's conditions during the relevant time period. While the new report from Dr. Charles may be relevant to the period in question, it is no more probative than Dr. Charles' prior reports, and therefore does not provide a basis to remand the case.

### D.      Use of the Medical-Vocational Guidelines

Finally, as explained in Section II(C), supra, the ALJ applied the Medical Vocational Guidelines (the "Grid") to determine that the Plaintiff was not disabled after finding that the Plaintiff retained the residual functional capacity to meet the demands of light work. The Plaintiff argues that resort to the Grid was improper because the Plaintiff has significant non-exertional impairments and testimony from a vocational expert was required in this case.

In the fifth step of the disability determination, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980). The Commissioner may rely on the Grid to meet his Step Five burden. Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).[12] However, the Grid is inapplicable in cases where the claimant exhibits a so-called "non-exertional impairment"

---

[11] If Plaintiff's limitations have in fact worsened, as suggested by Dr. Sherman, then Plaintiff's recourse should be to file a new claim. See 20 C.F.R. §404.976(b)(1).

[12] "The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability." Zorilla, 915 F. Supp. at 667.

that significantly diminishes the claimant's ability to work.  Vargas v. Astrue, No. 10 Civ. 6306

(PKC), 2011 WL 2946371, at *13 (S.D.N.Y. Nov. 2, 2011).[13]  In such situations, the ALJ is

required to consult with a vocational expert.  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The need for expert testimony is determined on a case-by-case basis.  Bapp v. Bowen,

802 F.2d 601, 605 (2d Cir. 1986).  "If the guidelines adequately reflect a claimant's condition,

then their use to determine disability status is appropriate."  Id.  But, if a claimant's non-

exertional impairments significantly limit the claimant's range of work—such that the

impairments cause an "additional loss of work capacity beyond a negligible one or, in other

words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful

employment opportunity"—the Grid "will not adequately determine disability status," and expert

testimony is required.  Id. at 605–06; see also Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir.

2010).

Here, it is undisputed that the Plaintiff's ability to work is hampered by non-exertional

impairments, including depression and anxiety.  (R. at 30.)  The ALJ found that the Plaintiff

suffered from these non-exertional impairments in her earlier analyses, but concluded in the fifth

step that the impairments had "little or no effect on the occupational base of unskilled work" and

proceeded to rely on the Grid.  (R. at 37.)  The ALJ did not elaborate on or explain her

conclusion that the Plaintiff's non-exertional impairments were not significant enough to warrant

vocational testimony.

---

[13] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling).  Zorilla, 915 F. Supp. at 667 n. 3 (citing 20 C.F.R. § 404.1569a(b)).  "A non-exertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain."  Sobolewski v. Apfel, 985 F.Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a(a), (c)).

Although an ALJ has discretion to conclude that the Grid adequately addresses a plaintiff's non-exertional impairments, courts in this Circuit have held that the ALJ is obligated to explain such a finding.  See, e.g., Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996) (ALJ erred by failing to "specifically articulate the non-exertional impairments that [the plaintiff] suffered" so that the court could "fathom the ALJ's rationale in relation to the evidence in the record"); Bapp v. Bowen, 802 F.2d at 606 (holding that an ALJ must consider an "intermediate question" of whether the range of work the claimant can perform is "so significantly diminished as to require the introduction of vocational testimony"); Cruz v. Colvin, No. 12-CV-7346 (PAC/AJP), 2013 WL 3333040, at *19 (S.D.N.Y. July 2, 2013) ("If [the ALJ] treated the Grid as dispositive because he found that [the plaintiff's] non-exertional limitations did not significantly reduce, or only had a negligible impact on, [the plaintiff's] work capacity, [the ALJ] was obligated to explain that finding."); Henriquez v. Chater, No. 94-CV-7699 (SS), 1996 WL 103828, at *4 (S.D.N.Y. March 11, 1996) (remand required, in part, because the record "does not … indicate whether the ALJ considered the relevance of expert vocational testimony and concluded that none was needed, or whether he simply skipped this step.").  In this case, although the ALJ was within her discretion when she concluded that the Grid adequately addressed the Plaintiff's impairments, the ALJ's failure to explain this finding amounted to legal error.

Further, the ALJ failed to account for the Plaintiff's exertional impairments—that is, her knee, back, and hand pains—when she relied on the Grid.  When a claimant has both exertional and non-exertional limitations, the Second Circuit has repeatedly held that consultation from a vocational expert is required.  See, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a negligible impact on a claimant's ability to perform the full range of work, and

instead must obtain the testimony of a vocational expert.") (internal quotation marks and citation omitted); <u>Rosa v. Callahan</u>, 168 F.3d at 82 ("Where significant non-exertional impairments are present at the fifth step in the disability analysis . . . application of the grids is inappropriate. Instead, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform. ") (internal quotation marks and citations omitted); <u>Suarez v. Comm'r of Soc. Sec.</u>, No. 09–CV–338, 2010 WL 3322536, at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has non-exertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert.") (quoting <u>Zabala</u>, 595 F.3d 402).

For the above reasons, remand is appropriate in this case.  Upon remand, the ALJ should seek the opinion of a vocational expert, or alternatively, explain why the Grid can be treated as dispositive under these circumstances.

## IV.    CONCLUSION

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings is DENIED and the Plaintiff's motion for judgment on the pleadings is GRANTED to the extent of remanding the case to the Commissioner for further proceeding consistent with this Opinion.

IT IS SO ORDERED.

Dated: New York, NY
August 7, 2014


_____/s/_____
Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order were sent to:

**Charles E Binder**
Binder and Binder P.C.
60 East 42nd Street
Suite 520
New York, NY 10165
212-677-6801
Fax: 646-273-2196
Email: fedcourt@binderlawfirm.com

**Leslie A. Ramirez-Fisher**
United States Attorney's Office
Southern District of New York
86 Chambers Street
3rd Floor
New York, NY 10007
(212) 637-0378
Fax: (212) 637-2750
Email: leslie.ramirez-fisher@usdoj.gov

**Sandra M. Grossfeld**
Social Security Administration
Office of The General Counsel
26 Federal Plaza, Rm. 3904
New York, NY 10278
(212)-264-2362
Fax: (212)-264-6372
Email: sandra.grossfeld@ssa.gov